INTERSTATE FIRE INSURANCE COMPANY

v.

UNITED STATES of America (two cases).

Civ. A. Nos. 3604, 3639.

United States District Court
E. D. Tennessee, S. D.

March 6, 1963.

Swafford, Jahn & Taylor, Chattanooga, Tenn., for plaintiff.

George Hrdlicka, Tax Division, Washington, D. C., for defendant.

FRANK W. WILSON, District Judge.

These two lawsuits are actions by a taxpayer to recover the sum of $313,996.-30, plus interest, claimed to have been over paid as federal income taxes and excess profit taxes for the calendar years 1952 through 1957 inclusive. There are two lawsuits by reason of the fact that

two separate claims for refund were filed and acted upon at different times, Case No. 3604 involving a claim for a refund relating to the years 1952 through 1955, and Case No. 3639 involving a claim for a refund relating to the years 1956 and 1957. The same issues are involved in each case and the cases were therefore consolidated for trial.

The facts in these lawsuits are largely undisputed, either by reason of having been stipulated or by reason of the testimony being undisputed. The Interstate Fire Insurance Company was organized in 1951 as a wholly owned subsidiary of Interstate Life and Accident Insurance Company, the latter company having been in the life and casualty insurance business since 1929. For brevity and clarity these two companies will be referred to in this opinion as the "Fire Company" and the "Life Company." The Fire Company is the only party plaintiff in these suits, with the Life Company not being involved as a party. Since the organization of the Fire Company not only has it at all times remained a wholly owned subsidiary of the Life Company, but the officers, directors, executive committees and finance committees of both companies have at all times been the same with the same individuals holding corresponding positions in each company, and the two companies have shared offices and other facilities. At the time of the organization of the Fire Company it entered into an agency contract with the Life Company whereby in consideration of payment to the Life Company of 90% of the Fire Company's premium income, the Life Company would perform all work through its employees and pay all expenses involved in producing business and settling claims, leaving the Fire Company with 10% of the gross premium income, out of which it was to pay officers' salaries and possibly other items. This contract was modified from time to time as will be more fully noted hereinafter. Proper records were kept of all income and disbursements of the two companies and the accuracy of these records is not in any way in dispute.

Both the Life Company and the Fire Company sold insurance policies that are referred to as "industrial policies," meaning that they were written specifically with the needs of industrial workers in mind, having a smaller than usual face value and being normally paid for on a weekly premium basis. Almost all of the insurance sold by the Fire Company was of the industrial or weekly premium type.

Income tax returns were duly filed by the Fire Company upon a calendar year basis for each of the years 1951 through 1957 and income taxes were paid accordingly. In each of the returns a deduction was made for a reserve entitled "Unearned Premium Reserve." Likewise, in making the original return for each of the years 1951 through 1956, the allocation of deductible expenses by the Fire Company and the Life Company was based upon the agency contract currently in effect between the two companies. The original 1957 return allocated expenses between the two companies, not in accordance with the agency contract then existing between the companies, but rather on a cost accounting basis, which will be more fully discussed in a later portion of this Opinion. The development and application of the cost accounting system grew out of an Internal Revenue Service review and investigation during 1957 of the plaintiff's prior returns, and the details of this will likewise be more fully discussed later. Suffice it to say for the present that about 1957 the taxpayer deemed that an error to its disadvantage had been made in calculating the amount of the unearned premium reserve for each of the previous years and further that it was entitled to apply a cost accounting method of allocating expenses between the parent company and itself with respect to each of the previous years as well as to the year 1957. Consequently, amended returns were filed by the taxpayer for each of the years 1951 through 1956. The Internal Revenue Service declined to accept any adjustment of the unearned premium reserve and declined to permit application of a

cost accounting system for allocating expenses between the Life Company and the Fire Company for previous years, insisting that the unearned premium reserve was correctly stated in the original returns and that the correct method of allocating expenses was in accordance with the agency contracts between the two companies. Assessments of taxes were made by the government accordingly and these assessments were paid by the taxpayer and claims for refunds were duly and timely filed by the taxpayer.[1]

It is conceded that the statute of limitations has run against both the plaintiff and the defendant with respect to the allowance of refund claims for the years 1951 and 1952, except to the extent that the plaintiff received a tentative carry back allowance from the year 1954 to the year 1952, which matter has however been adjusted between the parties and is not in issue here.

Two major issues remain for decision. The first issue is as to the correct method, under applicable tax laws and regulations, of establishing the plaintiff insurance company's unearned premium reserve for purposes of deduction and in the light of a resolution of this issue, determining whether any amendment of prior tax returns in this regard would be lawful and proper.

The second major issue for determination is whether the cost accounting method of allocating expenses between the Life Company and the Fire Company, as proposed by the Fire Company, is correct, lawful, and proper, and if so, whether any amendment of a prior tax return for any year or years in this regard would be lawful and proper.

Turning first then to the unearned premium reserve problem, as stated above the Fire Company sold an industrial fire policy upon which the premiums were payable weekly. The Fire Company was in fact a pioneer in the sale of an industrial type fire insurance policy and has grown to be one of the leading insurance companies in this field in the United States. Although the weekly premium policy was not the total business of the company, it did constitute approximately 99% of the business, and the only premium reserve here involved is with respect to the weekly premium policies. In the original tax returns filed by the taxpayer, the unearned premium reserve was established by setting up one-half of the debits, or premiums paid, for the last weekly premium period in the calendar year. The increase in the premium reserve thus established over the premium reserve for the previous year was then taken as a deductible item in determining taxable income. In the course of the study and review of its previous returns, the taxpayer concluded that it had overlooked the grace period provided in the policy and that in establishing the unearned premium reserve it should have included the four weeks grace period provided in the policy in determining the unearned premium reserve.

Under 26 U.S.C.A. § 832 "taxable income" of insurance companies for the payment of income tax is defined as including "premiums earned" which in turn is to be computed as follows:

"(4) Premiums earned.—The term 'premiums earned on insurance contracts during the taxable year' means an amount computed as follows:

"(A) From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

"(B) To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned

1. A deduction was also made for a reserve entitled "Catastrophe Reserve" but the taxpayer has acceded to the Internal Revenue Service's objection to this deduction and no issue relating to the catastrophe reserve is involved in this lawsuit.

premiums on outstanding business at the end of the taxable year." [2]

No further statutory definition of "premiums earned" or "unearned premiums" is contained in the Internal Revenue Code. Reference is made in Section 832 to gross income being "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners."

As a matter of mutual assistance and to achieve greater uniformity in the regulation of insurance companies, the various state insurance commissioners have organized the National Convention of Insurance Commissioners. This group publishes standard detailed forms for each type of insurance company to report its annual financial condition upon, the form being commonly referred to as the "Convention Form" or "Annual Statement." The Insurance Department of the State of Tennessee, as well as all other states in which the Fire Company was doing business, have adopted the Convention Form as the official form for annual reports by insurance companies in the said states.

██ It has been stated that the Convention Form, having been specifically referred to in Section 832, becomes not merely a guide, but in fact the statutory standard for arriving at the taxable income of insurance companies. Commissioner of Internal Revenue v. New Hampshire Fire Insurance Company, 1 Cir., 146 F.2d 697. Closer scrutiny of the Convention Form reveals, however, that no fixed formula is stated therein for calculating the unearned premium reserve. In view of the fact that Congress has made no attempt to prescribe a formula for determining unearned premiums or otherwise to define the words, the Court can only conclude that the term "unearned premiums" should be considered as having been used in the sense in which

such terms are generally used and understood in the insurance business. C. I. R. v. New Hampshire Fire Insurance Co., supra; Massachusetts Protective Association, Inc. v. United States, 1 Cir., 114 F.2d 304.

The undisputed testimony in this case reveals that the usual practice in the fire insurance business is to calculate the unearned premium reserve on the basis of setting aside as unearned premium an amount proportionate to the average unexpired term of all policies in force at the end of the tax year. The idea and logic behind this is that premium income, for tax purposes, should be allocated to and accounted for in each tax year in a manner corresponding to the lapse of the policy period for which it is paid.

The ordinary fire policy customarily is for a term of one year or longer. Rather than calculate the premium reserve of each such policy separately, it is assumed that at the end of any tax year the average policy written on an annual basis has been in effect for one-half of the tax year, and therefore it is customary to calculate the unearned premium reserve upon the Convention Form by setting aside one-half of the annual premium on policies in force at the end of the tax year as the unearned premium reserve. In other words, the formula was to designate as unearned premium reserve such portion of the premiums paid prior to the end of the tax year on policies in effect at the end of the tax year as corresponds to the average unexpired term of such policies.

Upon the assumption that this same formula would apply to its weekly policy, the taxpayer designated as unearned premiums in the Convention Form and on its tax return for each year in question one-half of the premiums paid for the last weekly premium period in the calendar year, and used the amount so arrived at in determining the unearned premium increase for purposes of deduc-

2. A portion of the tax returns under consideration were filed prior to the enactment of the Internal Revenue Code of 1954. The corresponding section of the

Internal Revenue Code of 1939 (26 U.S. C.A. § 204 [b] [5]) used similar language, and further reference will be made only to the relevant 1954 Code provision.

tion from income under Section 832 for each year in question. The Internal Revenue Service has accepted this as the correct method of determining the unearned premium reserve. However, as stated above, the taxpayer upon review and reconsideration of its tax returns, concluded that it had erred to its disadvantage in overlooking the four week grace period provided for in the policy and in failing to take this into consideration in determining the average unexpired term of its policies in force at the end of the year.

The problem presented here appears to be one of first impression. It is whether or not the grace period provided in the policy should be taken into consideration in establishing the unearned premium reserve.

The same standard policy was used by the Fire Company during all of the years in question in connection with its industrial fire business. The crucial provisions of the said policy insofar as the unearned premium reserve computation is concerned were as follows:

"(a) The term of the policy is specified as 'beginning at noon of the date hereof to noon of the following Monday, standard time, at the location of the property insured, and continuously thereafter from Monday to Monday of each succeeding week for which the premium is paid in advance.

"(b) Each premium is due and payable in advance at the Home Office of the company but may be accepted elsewhere by a duly authorized agent. All premiums paid shall be forfeited to the company and this policy shall terminate by lapse and all liability hereunder shall cease when the required premiums are more than four weeks in arrears.

"(c) A grace period of four weeks shall be granted for the payment of every premium after the first, during which time the policy shall continue in force. All premiums in arrears at the time of any loss hereunder

shall be deducted from any payment of a claim hereunder."

It is contended by the plaintiff that the four week grace period effectively converted its policy into a "continuous" policy in that the policy is issued only once and, so long as the premiums are paid, remains in force indefinitely. This is contrasted with the ordinary fire insurance policy where a definite term is specified, where no grace period is provided, and where a new policy is issued at the end of each policy term if the insurance is kept in force by the insured.

It was the testimony of the witnesses upon behalf of the plaintiff that ideally the premium reserve should be calculated on each policy separately, and that a portion of each weekly premium in direct ratio of the grace period to the total period the policy has been in force should be set aside as unearned premium reserve, to cover the four week grace period, such portion to decline for each additional week the policy remained in effect. This process would continue so long as the policy stayed in force. It was further testified that a reasonably close approximation of this ideal might be achieved by averaging all policies annually, considering the term of the policies in existence throughout the tax year as being 52 weeks plus four weeks grace period, or a total term of 56 weeks, and considering policies issued during the tax year as having been issued six months on the average and therefore having a term of 26 weeks, plus four weeks grace period, or a total term of 30 weeks. It is therefore contended by the plaintiff that the correct method of determining the unearned premium reserve with respect to its weekly premium policy is as follows:

"(a) One-half of the premiums paid for the last weekly premium period in the calendar year (on the assumption that on the average the policy would have been in effect for one-half a week at the end of the year); plus

"(b) Four-thirtieths of the premiums paid during the year on all

policies in force at the end of the year and which were issued during the year (on the assumption that on the average policies issued during the year will have been in effect six months at the end of the year and that the premiums paid thereon will be for an average term of 26 weeks plus a four weeks grace period); plus

"(c) Four-fifty-sixths of the premiums paid during the year on all policies in existence throughout the year (on the assumption that the premiums paid will be for a term of 56 weeks plus a four weeks grace period).

The contention of the plaintiff in this regard is based upon the assumption that a portion of each premium received is in payment for the four weeks grace period and is to that extent unearned income. It is the opinion of the Court that a correct understanding of the nature of the grace period in the plaintiff's policy does not warrant such a conclusion. Although the length of the grace period in the plaintiff's policy relative to the term of the policy is perhaps unique, being a four weeks grace period on a one week policy, and although the allowance of a grace period in a fire insurance policy may be unique, the practice of allowing a grace period in insurance policies generally is quite common. A grace period, when correctly viewed, can only be considered as the sale of insurance upon credit. A grace period is not a gift of insurance. Rather, it is a grant of permission *to defer payment*.

As stated in 6 Couch, Insurance, 2d, Section 32: 132–133:

"Grace clauses are inserted in insurance policies solely for the purpose of preventing a lapse immediately upon failure to pay a stipulated premium. * * *

"[T]he grace period does not change the due date of the premium as stated above in this section and * * * such a provision does not contemplate free insurance, being merely an extension of an opportunity to pay, and contemplates ultimate payment for the period. It is clear that free insurance is not provided by a grace period where the policy states that a premium in default should be deducted from the amount of insurance payable."

When viewed in this light, it is apparent that the grace period is not paid for by previously paid premiums, but rather that coverage during the grace period is "paid for" by the extension of credit or by deferred payments. Certainly no premium refund could be claimed by a policyholder during the grace period. Likewise a policyholder who never uses the grace period cannot claim a refund therefor in event he should elect to cancel his policy. It is specifically contemplated in the plaintiff's policy, as it is generally in insurance policies containing a grace period, that payment will be made for coverage during the grace period, and that in event of a loss during the grace period the unpaid premiums will be deducted from any settlement due under the policy.

As stated, the use of a grace period is common in the insurance business. To allow the plaintiff to include the grace period in the term of the policy in determining the unearned premium reserve would permit all insurance companies, of every type, having grace periods in their policies, to do likewise. The mere unusual length of the grace period in this case in relation to the period of the policy, or in relation to the premium payment periods, does not alter the nature of the transaction. It remains merely a sale of insurance upon credit. In this regard it is significant that, although the use of grace periods is common, no case is cited wherein an unearned premium deduction was allowed for the grace period, nor was there any testimony indicating that other insurance companies have claimed an unearned premium reserve for grace periods, or that the term "unearned premium" is generally used and understood in the insurance business as including an allocation based upon

grace periods. A 30 day grace period upon policies payable annually or semi-annually is not unusual. To consider the premiums paid as applying to the grace period would be analogous to allocating a portion of a cash down payment on the sale of property to the unpaid balance for purposes of tax accounting. This can only be done by reason of the specific provision in the tax laws for bad debt reserves. We are not dealing here with a bad debt reserve for unpaid premiums, but rather with an *unearned* premium reserve.

The Court can only conclude that the phrase "unearned premiums" as used in Section 832, both as a matter of law and logic, and as used and understood in the insurance business generally, means those premiums received during the tax year which are applicable to and in payment for that portion of the unexpired term of the insurance as of the end of the tax year,[3] excluding any grace period for which additional payment is contemplated. The grace period is properly regarded merely as an extension of time for the payment of premiums after the first premium, and not as a portion of the period of risk for which a previous premium is paid.

Having concluded that the taxpayer's proposed recalculation of its unearned premium reserve for the years 1951 through 1957 as reflected in its amended returns is incorrect and that the original returns reflect the correct calculation of this deduction, it is unnecessary for the Court to consider the problems of estoppel, election and change of accounting method raised in this lawsuit with respect to the right of the taxpayer to amend its original returns.

The second major issue for decision relates to the allocation of expenses as between the Fire Company and the Life Company. The plaintiff contends that the cost accounting method which it has developed for allocating expenses is the correct and lawful method for all years concerned, that it had a right to amend its returns to adopt this method for each of the years through 1956, during which years the original returns allocated expenses on the basis of the agency contract between the Fire Company and the Life Company. The right to make this change is claimed for a number of reasons, one of which is that the reallocation was required by the government's having "invoked" Section 482 against the plaintiff as a controlled taxpayer.

A history of the agency contracts between the Fire Company and the Life Company reflects that the initial contract entered into upon March 22, 1951, provided for a basic 90%–10% split between the companies with the Life Company to pay all expenses involved in producing the business and settling claims out of its 90% share. Various modifications were made to the contract from time to time, with the last modification, entered into upon June 24, 1955, providing for the payment by the Fire Company to the Life Company of 85% of the gross premiums after payment of all claims, but not less than 55% of the gross premiums received.

During the spring of 1957 Henry J. McCoy, an Internal Revenue Service Agent at Chattanooga, Tennessee, undertook to review and audit the 1955 return of the plaintiff. In the course of this investigation an issue was raised by the District Director of Internal Revenue at Nashville as to whether there had been a proper allocation of expenses as between the Fire Company and the Life Company in view of the parent-subsidiary relationship between them, the Fire Company being considered a "controlled taxpayer" by the Internal Revenue Service. Agent McCoy thereupon advised the taxpayer that it would be required to reallocate expenses in accordance with Sec-

---

3. The premium upon a policy having an *indefinite term*, as for example the premium upon a title insurance policy, is considered fully earned when paid. See Massachusetts Protective Association v. United States, 1 Cir., 114 F.2d 304; Wayne Title & Trust Company v. Commissioner, 3 Cir., 195 F.2d 401; American Title Company v. Commissioner, 3 Cir., 76 F.2d 332.

tion 482 of the Internal Revenue Code, which section grants the Secretary of the Treasury or his delegate the authority to reallocate the expenses of a controlled taxpayer when necessary to avoid tax evasion or to clearly reflect income.[4]

Considerable controversy exists in the case as to whether Agent McCoy "invoked" Section 482 and, even if he did, as to whether he had authority to do so. There is no dispute in the record, however, that Agent McCoy did advise the taxpayer that it would be required to reallocate expenses under Section 482. More than one witness for the plaintiff so testified. The government did not put Agent McCoy on the witness stand, although he was present throughout the trial, nor introduce any testimony in this regard. Moreover, it is undisputed in the record that as a result of being so advised, the plaintiff undertook in 1957 to develop a cost accounting system as a basis for reallocating expenses for the 1955 return. This work was performed in full consultation with Agent McCoy and with other IRS agents. Before pursuing further the problem of whether McCoy did in fact "invoke" Section 482 and whether he had authority to do so, it is appropriate at this point to consider the validity, from an accounting viewpoint, of the cost accounting method developed and applied by the taxpayer.

Quite extensive testimony was put in the record as to how the cost accounting system was developed and that it was based upon sound accounting principles generally accepted in the insurance trade. It appears that it closely follows the Uniform Accounting Instructions adopted by the National Association of Insurance Commissioners in December of 1948, and specifically regulations 30 and 33 of the New York State Insurance Department pertaining to fire companies and life companies respectively, which regulations are identical with the said Uniform Accounting Instructions.

Some controversy exists in the record as to the proper accounting method for allocating certain expenses, in particular the commissions paid to the agents selling insurance for both companies, but the Court finds that the great weight of the testimony supports the contention of the plaintiff that the cost accounting system developed by it was a sound and correct system from an accounting viewpoint. It therefore follows that all of the figures, calculations and allocations based upon the cost accounting system developed by the plaintiff are accepted by the Court as true and correct from a mathematical and accounting viewpoint.

The work of developing the cost accounting system was accomplished during the latter half of 1957 and the first part of 1958. Having developed the system, the plaintiff proceeded to apply it not only to 1955 but to each year beginning with the initial operation in 1951. The original 1957 return was filed by the plaintiff on this cost accounting basis for allocating expenses, and the plaintiff filed an amended return for each of the years 1951 through 1956 based upon this system.

The issue therefore resolves itself into determining whether the plaintiff has a right to file upon the cost accounting basis for any year involved, either by reason of the allocation having been made under Section 482 or for any other reason.

■ The plaintiff contends that the allocation was made under Section 482, at least for the year 1955, and that having been made for 1955 the plaintiff

4. "§ 482. *Allocation of Income and Deductions Among Taxpayers.* In any case of two or more organizations, trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

is permitted to make it for all other years in the interest of being consistent and correct. Both parties use the word "invoke" in referring to the application or non-application of Section 482. The government contends that Agent McCoy had no authority to "invoke" Section 482, that such authority was limited to the Secretary of the Treasury or his delegate, and that under Treasury Regulation No. 118, the Secretary of the Treasury delegated authority only to District Directors.[5] Nothing is cited by the government, however, wherein the District Director is prohibited, as a matter of law, from redelegating such authority to a revenue agent. On the contrary, it appears that his general authority to redelegate would grant such authority. It therefore becomes a question of fact whether there was a redelegation in this regard to Agent McCoy. Under the proof in this case, the Court finds that Agent McCoy was authorized to do all that he did do with regard to the reallocation of expenses for the 1955 tax return. Whether this constituted "invoking" Section 482 so as to require or permit the

plaintiff to file an amended return for 1955 on the cost accounting basis depends upon what is meant by "invoking."

Actually, the word "invoke" has no statutory basis in this regard. It is apparent that the parties attach substantially different meaning to the word. The plaintiff appears to use the word "invoke" as meaning initiation by the government of a reallocation under Section 482. The defendant on the other hand appears to use the word "invoke" as meaning a reallocation resulting in a reassessment of taxes under Section 482.

Section 482 provides that the Secretary of the Treasury or his delegate "may" reallocate the expenses, etc., of a controlled taxpayer "if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect income." The above quoted language makes two things apparent. In the first place, use of Section 482 is discretionary with the Secretary or his delegate. Both the legislative history[6] and the treasury regulations issued confirm this.[7] In the

5. Treasury Regulation No. 118 was promulgated under Section 45 of the Internal Revenue Code of 1939, but was in effect under Section 482 of the Internal Revenue Code of 1954 during the years in question by virtue of the interim provisions contained in Section 7807 of the 1954 Code. Substantially the same provisions were adopted upon April 13, 1962 under the 1954 Code, being Treasury Regulation of income tax, Section 1.482-1. The only significant change made by the 1954 Code regulations was to change the delegation of authority to utilize Section 482 from the "Commissioner" as provided in Regulation No. 118 to the "District Director."

6. The original forerunner of Section 482 of the Internal Revenue Code of 1954 was Section 420(d) of the Revenue Act of 1921, C. 136, 42 Stat. 224. The initial enactment was part of the consolidated returns section and authorized the Commissioner of Internal Revenue to consolidate the accounts of related trades or businesses in order accurately to reflect their income. Section 240(d) of the Revenue Act of 1924, C. 234, 43 Stat. 253, added the requirement that the accounts of related trades or businesses be con-

solidated at the request of the taxpayer. While this provision was in effect the taxpayer was permitted to request a consolidation, which the Commissioner could not refuse unless he determined that consolidation was not necessary to reflect income accurately. Nolan Realty Co. v. Commissioner, 7 Cir., 47 F.2d 1018; First Securities Corp. of Memphis v. Clements, 6 Cir., 103 F.2d 1011. The Revenue Act of 1928, C. 852, 45 Stat. 791, enlarged the Commissioner's authority to reallocate and eliminated the right of the taxpayer to request a consolidation.

7. See Treasury Regulations 118, Sec. 39.-45-1(3). "Section 45 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the Commissioner to apply such provision. It is not intended (except in the case of the computation of consolidated net income under a consolidated return) to effect in any case such a distribution, apportionment or allocation of gross income, deductions, credits or allowances as would produce a result equivalent to a computation of a consolidated net income under Section 141."

second place, use of Section 482 requires a determination by the Secretary or his delegate that a reallocation is necessary to avoid tax evasion or to clearly reflect the income. National Securities Corp. v. Commissioner, 3 Cir., 137 F.2d 600.

In view of the discretion invested in the Secretary or his delegate, it is likewise apparent that Section 482 can only be invoked by the government and its use is not a matter of right with the taxpayer. To contend otherwise would be to extend rights and privileges under Section 482 to a controlled taxpayer not enjoyed by other taxpayers, an obviously untenable result.

At what point can it be said that the Secretary or his delegate must cease his investigation and make a determination of necessity on penalty of losing any further discretion in the application of Section 482? Is it merely upon determining that the taxpayer is a controlled taxpayer? Obviously not. Is it upon request to a controlled taxpayer to submit a reallocation? How can he possibly know the tax consequences at that stage? And yet his finding of necessity is expressly required to be based upon the tax consequences. It is therefore clear that the Secretary or his delegate is not obligated to exercise his discretion in this regard until the tax consequences of the reallocation are known to him. To compel him to exercise his discretion should the consequences of the reallocation be favorable to the taxpayer would be either to deprive him of any discretion with the untenable consequence noted above of granting rights to controlled taxpayers not enjoyed by other taxpayers, or to require him to exercise that discretion before having any idea as to what the tax consequences would be or as to what need or justification there might be for using Section 482. It is apparent from the legislative history of the statute and from the statute itself that the purpose of the statute is to prevent evasion or minimizing of taxes by controlled taxpayers, so surely the statute does not compel the government to invoke Section 482 to enable controlled taxpayers to alter their returns to their advantage when no like remedy is available to other taxpayers.

The Court therefore concludes that as a general rule the use and application of Section 482 does not result in an enforcible tax consequence until there has been a reallocation resulting in a reassessment of taxes. An exception to this rule may exist under the facts of any particular case where those facts warrant the application of recognized legal or equitable doctrines that would alter this result, such as an abuse of discretion on the part of an official vested with discretion, or the doctrine of estoppel, both of which are here asserted by the taxpayer.

Considering first any alleged abuse of discretion, it should be noted that the taxpayer has the burden of showing clearly that the action of the Secretary or his delegate has been arbitrary or wholly unreasonable. National Securities Corp., 46 B.T.A. 562, Leedy-Glover Realty & Ins. Co. et al., 13 T.C. 95, affirmed 5 Cir., 184 F.2d 833. The Court cannot say that the failure of the Secretary or his delegate to exercise his discretion in favor of making a reassessment on the basis of the cost accounting reallocation, instead of upon the basis of the existing agency contract, was so arbitrary or capricious as to constitute an abuse of discretion or as to permit a substitution of judicial discretion. A rational argument can be made for either method of allocating expenses under the facts of this case. The discretion to choose between the two therefore rests with the Secretary or his delegate and the fact that the consequences of reallocation might be favorable or unfavorable to the taxpayer or favorable or unfavorable to the government would constitute no reason for depriving the Secretary or his delegate of the discretion vested in them by statute.

Under the facts of this case it is further contended by the taxpayer that the government is estopped from refusing to

apply the reallocation, at least to the 1955 tax return. It is contended that by its actions the government has estopped itself from reserving until after the completion of the reallocation any decision as to whether to use the reallocation.

■ It is sometimes stated as a general rule that estoppel cannot operate against the government. Spencer v. Railroad Retirement Board, 3 Cir., 166 F.2d 342; Walker-Hill Co. v. United States, 7 Cir., 162 F.2d 259, certiorari denied 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356; N. L. R. B. v. T. W. Phillips Gas & Oil Co., 3 Cir., 141 F.2d 304. The cases appearing to so hold can generally be distinguished as stating one or more of the many exceptions to the application of the doctrine of estoppel as against the government, as for example, where no consent to be sued has been granted by the government, or where it is stated that the government cannot be estopped by an unauthorized act of one of its agents, Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 381, 68 S.Ct. 1, 92 L.Ed. 10, Ritter v. United States, 28 F.2d 265, or where a government agent purports to authorize that which is forbidden by law, Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791. The rule that estoppel may apply against the government in appropriate situations, however, is well stated in the case of Smale & Robinson, Inc. v. United States, D.C., 123 F.Supp. 457, where the Court, after a full discussion of the above exceptions, in a well reasoned opinion states the rule to be as follows:

"The United States has long consented to respond to liability for and to be sued on claims for tax refunds, 26 U.S.C. § 3772; Lowe Bros. Co. v. United States, supra, 304 U.S. [302] at pages 305–306, 58 S.Ct. [896] at pages 897–898 [82 L.Ed. 1362], and the authorities cited lead to

the conclusion that a taxpayer should be permitted to invoke the doctrine of equitable estoppel against the Government in cases where: (1) there has been a waiver of sovereign immunity both as to liability and as to suit, cf. Hopkins v. Clemson Agricultural College, 1911, 221 U.S. 636, 646, 31 S.Ct. 654, 55 L.Ed. 890, (2) the agent whose conduct is relied upon to work an estoppel acted within the scope of his authority lawfully conferred, and (3) application of the doctrine would not bring a result that is either inequitable or contrary to law."

■ Under the facts of this case, as the Court has found them to be, an IRS agent acting within the scope of his authority requested the plaintiff to perform the work necessary to reallocate expenses under Section 482. At that time the tax consequences of the reallocation were equally unknown to the taxpayer as to the government. The plaintiff reasonably understood that a reassessment of taxes would be made on the basis of the cost accounting reallocation, a result that would not in any way be contrary to law. The plaintiff relied upon this representation and in good faith undertook the work incident to performing the reallocation in a manner approved by the government. This work was performed at an expense of approximately $25,000 to the taxpayer.[3] Thus, all of the elements of a valid estoppel exist and the Court accordingly concludes that the government is bound by the doctrine of estoppel with respect to the taxpayer's claim for a refund based upon use of the cost accounting reallocation of expenses for the year 1955. No facts exist however warranting the application of the doctrine of estoppel to any other year than 1955. The allowance of the taxpayer's claim for refund upon this basis for the year 1955 would form no basis for the application of the cost accounting

3. This expense was not wholly without benefit to the taxpayer and the Life Company, as the system has been used by both companies in the years subsequent to the system's development.

reallocation to years other than 1955 nor for the allowance of any refund for any other year.

The holding of the Court in this respect does not in any way alter the administrative discretion of the Secretary or his delegate under Section 482. He is merely prevented by the normal rules of estoppel from shifting the burden of performing the reallocation to the taxpayer under circumstances that would justify the taxpayer in believing that the results of the reallocation would be utilized in making a reassessment of taxes and still retain discretion on the use or non use of the reallocation until after completion of the work by the taxpayer. Cooperation and willing compliance of taxpayers is important to the orderly and successful operation of the Federal Income Tax Laws. Common honesty and good conscience require that taxpayers receive ordinary fair play from tax officials. While men must learn to turn square corners when they deal with the government, as observed by Justice Jackson in his dissent in the case of Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 at 388, 68 S.Ct. 1, 92 L.Ed. 10, "there is no reason why the square corners should constitute a one-way street."

It is next contended by the plaintiff and denied by the government that irrespective of the application of Section 482, the plaintiff is entitled to correct its tax return for the years involved by filing amended returns based upon the cost accounting allocation of expenses. The plaintiff's contention in this regard is that (1) the agency contract between the Fire Company and the Life Company, upon which the original returns were based, was in fact illegal as its consequence was to place the Life Company into the fire insurance business contrary to any grant of authority in its charter; (2) the amended returns based upon the cost accounting system merely correct errors in the original returns which were based upon the illegal contract, and such errors might properly be corrected without consent of the IRS at any time prior to the running of the statute of limitations.

The government not only disputes the above contentions, but contends that the plaintiff has made a binding election by filing the original returns, and/or is estopped by the filing of the original returns, and/or that the proposed change would constitute a change in accounting methods requiring the approval of the Internal Revenue Service, which approval has never been granted. In response to this latter contention of the government the plaintiff denies that the proposed change in its returns would constitute a change in accounting methods requiring approval of the Internal Revenue Service, but contends that even if this were so, the government as a practical matter has consented to the change by virtue of its request for and participation in the reallocation of expenses and the development of the cost accounting system.

To resolve these issues it becomes necessary to determine first whether the cost accounting basis for allocating expenses between the Fire Company and the Life Company, in lieu of the agency contract basis, would or would not constitute a change in the "method of accounting." Section 446(e) of the Internal Revenue Code provides that consent of the Secretary or his delegate must be obtained before a taxpayer is permitted to change the "method of accounting" in reporting his taxable income. To distinguish between a permissible correction of errors and a prohibited change of method of accounting, and to determine whether the taxpayer's proposed change here would constitute either, it becomes necessary to define the meaning of the phrase "method of accounting."

Although Section 446(c) does list permissible methods of accounting for tax purposes, no statutory definition of the term is made. Likewise no judicial definition of the term has been cited by the parties or otherwise come to the attention of the Court. It appears that the words have no generally recognized definition in the accounting field, but rather are words of significance in the tax accounting field by reason of their use in the Internal Revenue Code.

Upon consideration of the context in which the phrase is used in the Internal Revenue Code, in Treasury Department Regulations, and in consideration of the manner in which the phrase is applied in the decisions, it appears that the phrase "method of accounting" referred to in Section 446(e) of the Internal Revenue Code refers to a system of accounting which, while it may result in the reflection of items sooner or later for purposes of taxation than another system of accounting, nevertheless, if consistently followed over a period of time, would correctly and truly reflect the facts with regard to the taxpayer's taxable income in accordance with the income tax laws. In other words, a "method of accounting" is a system of accounting that may alter the time at which an item or items may appear or may be utilized in calculating taxable income, and may thereby alter the tax consequences either by advancing or deferring the date upon which such items become of tax significance, but the words "method of accounting" do not refer to the correction of errors required to truthfully and correctly state the facts involving items necessary to the ultimate determination of taxable income.[9]

When considered in this sense, it becomes apparent that the proposed change here advocated by the taxpayer does not constitute a change in the "method of accounting" requiring prior approval by the Secretary or his delegate. The change to another basis for the allocation of expenses between the Fire Company and the Life Company would neither advance nor defer the tax significance of items, but would completely alter the items themselves or completely alter the statement of facts with regard to the allocation of expenses.

Having eliminated any problems involving a change in the method of accounting, and thereby eliminated the requirement of prior approval by the Internal Revenue Service, it must next be determined whether the change here proposed by the taxpayer is the mere correction of errors in prior returns, which correction of errors is permissible under the tax laws. The taxpayer contends that the error which it seeks to correct was the expense allocation on the basis of the agency contract, which contract it is now averred was illegal. It is contended that the contract was illegal as it placed the Life Company in the fire insurance business, contrary to its charter, by shifting an excess amount of the Fire Company's expenses onto the Life Company. It is not believed by the Court, however, that a determination of the issue of the legality or illegality of the agency contract is essential to a decision of this case, for the law is well established that income derived even from an illegal contract would be taxable. Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833; Patterson v. Anderson, 20 F.Supp. 799 (S.D.N.Y.); Commonwealth Investment Company v. Commissioner, 44 B.T.A. 445; United States v. Simon, 281 F.2d 520 (C.A.6).

The plaintiff contends that it had no legal right to choose the agency contract method of allocating expenses, and therefore the filing of its original returns upon this basis constituted no binding election. The case of Thompson-King-Tate, Inc. v. United States, 296 F. 2d 290 (C.A. 6) is then cited by the plaintiff as supporting its position that an error may be corrected. However, that case held that erroneous reporting of income under the tax laws may be

9. See Williamson v. United States, 292 F.2d 524 (Court of Claims, 1961) wherein the Court stated that "there is some point at which all income which has accrued, in the sense of having been fully earned, will be realized and taxable to him who earned it regardless of the accounting method involved. An acceptable accounting method should simply indicate this point logically and consistently." See also 14th Tax Institute (1962) University of Southern California School of Law, p. 717 and 16th Annual Institute of Federal Taxation of the New York University (1958), p. 553.

corrected where, *under the tax laws,* income must be reported in a certain way and the taxpayer through error reported it in another way. It should be noted that the error referred to in the Thompson-King-Tate, Inc. v. United States case as being subject to retroactive alteration or correction by amended tax return after expiration of tax year is an error made under the tax laws themselves, and not an error arising outside of the tax laws, *as here involved,* such as an error of judgment or an error made by violating laws other than the tax laws, such as corporations acting ultra vires.

 What is proposed here is not a change in a "method of accounting," nor is it the correction of an error. Rather, what is proposed here is a retroactive modification of the facts upon which the taxpayer's business was actually conducted. What is proposed here is the retroactive alteration of the allocation of expenses between the Fire Company and the Life Company after expiration of the tax year. From 1951 through 1957 the Fire Company actually operated upon the basis of an agency contract with the Life Company whereby the Fire Company was to pay a certain percentage of its income in return for all services performed for it by the Life Company. Had the two companies been dealing at arms length they could have entered into any contract they mutually agreed upon insofar as tax consequences are concerned. The fact that they may not have been dealing at arms length only alters this to the extent that such contract could not result in tax evasion. Having entered into the contract they did, no retroactive alteration of this by the taxpayer after expiration of the tax year is permitted. Otherwise taxes would remain almost wholly uncertain until the expiration of the statute of limitations. Annual reporting for income tax purposes would become meaningless and tax reporting would in effect be for the period of the statute of limitations and not for an annual period.

As stated in the case of Television Industries, Inc. v. Commissioner, 2 Cir., 284 F.2d 322 at 325:

"The Commissioner is justified in determining the tax effect of transactions on the basis in which taxpayers have molded them, Gray v. Powell, 1941, 314 U.S. 402, 414, 62 S.Ct. 326, 86 L.Ed. 301; Interlochen v. C. I. R., 4 Cir., 1956, 232 F.2d 873, 877, although he may not always be required to do so, Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406. It would be quite intolerable to pyramid the existing complexities of tax laws by a law that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less."

To permit a retroactive distribution of expenses here would authorize such a practice in any case where the retroactive application of a cost accounting system would reflect a result different from that actually used. For example, two partners sharing net income upon an equal basis could, after the expiration of seven years, make a retroactive audit of the time spent by them on partnership business and file amended tax returns upon any differences reflected thereby.

It results that the plaintiff's claims for refunds will be denied in their entirety in Case No. 3639 and will be denied in Case No. 3604 except to the extent of allowing the plaintiff's claim for refund for the year 1955 as would result from use of the cost accounting system for allocation of expenses for that year only as between the Fire Company and the Life Company. This Opinion will constitute a findings of fact and conclusions of law in each case.

Orders will enter accordingly.