The **BUCKEYE UNION CASUALTY COM-**
**PANY and Subsidiary, Petitioner-**
Appellant,

v.

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent-Appellee.**

The **BUCKEYE UNION FIRE INSUR-**
**ANCE COMPANY, Petitioner-**
Appellant,

v.

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent-Appellee.**

Nos. 20565, 20566.

United States Court of Appeals,
Sixth Circuit.

Sept. 20, 1971.

George D. Massar, Columbus, Ohio, for petitioners-appellants; John W. Christensen, Richard J. Brentlinger, Columbus, Ohio, on the brief.

John S. Brown, Atty., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee; Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Harry Baum, Attys., Tax Div., Dept. of Justice, Washington, D. C., on the brief.

Before EDWARDS and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

Appellants are three affiliated fire and casualty insurance companies, The Buckeye Union Casualty Company (Casualty), its subsidiary, The Mayflower Insurance Company (Mayflower), and The Buckeye Union Fire Insurance Company (Fire), all doing business in Ohio and other states. In 1965, appellants (collectively referred to as the Old Buckeye Companies, or the taxpayers) transferred their insurance businesses as going concerns to The Buckeye Union Insurance Company (Continental Buckeye), a newly-formed and wholly-owned subsidiary of the Continental Insurance Company (Continental). This transfer and the contemporaneous reinsurance by

the transferee of all of taxpayers' policy liabilities were parts of a plan of complete liquidation of the Old Buckeye Companies adopted by the directors and stockholders of each company. It was consummated within twelve months of its adoption. This appeal is from a decision of the Tax Court of the United States upholding aggregate deficiencies of $5,124,514.33 assessed against the Old Buckeye Companies for their 1965 tax year. The Buckeye Union Casualty Company v. Commissioner, 54 T.C. No. 2 (1970). Taxpayers were taxable as insurance companies (other than a life or mutual insurance company) under Int. Rev.Code of 1954, § 831(a) (1), 26 U.S.C. § 831(a) (1).

The issue on appeal is whether the sum of $10,676,071.52 realized by taxpayers through retention of 35% of their unearned premium reserves at the time of the transfer of their insurance businesses was taxable income in the year of liquidation, as found by the Tax Court, or was, as appellants contend, gain from the sale or exchange of property within the meaning of Int.Rev. Code of 1954, § 337, 26 U.S.C. § 337, and entitled to nonrecognition as taxable income or gain.

On January 19, 1965, the board of directors of each of the Old Buckeye Companies adopted a plan of complete dissolution and liquidation which was ratified by their respective stockholders February 15, 1965.[1] Negotiations with Continental Insurance Company of New York for the acquisition of the insurance business of the taxpayers were concluded by agreements entered into on April 2, 1965; the deal was closed pursuant to these agreements April 26, 1965. These agreements, entitled "Reinsurance and Assumption Agreement" and "Supplemental Agreement," provided, in effect, for the acquisition by Continental's newly formed subsidiary, The Buckeye Union Insurance Company (Continental Buckeye), of the insurance business of the taxpayers' companies as going concerns, including some of the assets and properties used therein, and for the assumption by Continental Buckeye of all insurance obligations and liabilities of the Old Buckeye Companies. By the end of 1965, the Old Buckeye Companies liquidated and distributed to their shareholders all of their remaining assets, and had filed certificates of dissolution with the Ohio Secretary of State. The Reinsurance and Assumption Agreement provided that among the assets to be transferred to Continental Buckeye in consideration for the latter's assumption of all of the policy liability of the Old Buckeye Companies, would be,

"The unearned premium reserve for the gross policy liability assumed by the Assuming Insurer under Article I (a) hereof, less the unearned premium reserve for in force ceded reinsurance as of 12:01 A.M. S.T. January 1, 1965, *the amount to be paid to be computed at sixty-five percent of such net unearned premium reserve.*" (Emphasis supplied.)

At the consummation of the involved transactions, appellants' reserves for unearned premiums totalled $30,503,061.-49. The transfer of 65% thereof left free in the hands of appellants 35% thereof—$10,676,071.52—the amount found by the Tax Court to be taxable income. The deficiency assessed against appellants on account of such income was $5,124,514.33. No question is raised as to the accuracy of this figure if the Tax Court's basic finding is correct.

We affirm.

In the insurance business here involved, reserves for unearned premiums mean the total premiums theretofore reserved by the company upon policies, the obligations of which have not yet been fulfilled and performed. So long as

---

1. The assigned motivation for the consummation of this transaction was the wish of Mr. Frederick A. Jones—son of the founder of the Old Buckeye Group and president thereof after his father's death —to put "his house in order," lest an illness from which he was then suffering might precipitate his death. He and his family owned substantially fifty percent of the taxpayers.

they are part of the reserve for unearned premiums, they would have to be returned to the policyholders upon cancellation or remain available to satisfy any losses covered by such policies. When these contingencies have expired, the reserves become income to the company. The term "unearned premium reserve" so long as it is a reserve deductible under 26 U.S.C. § 832(b) (4), is generally defined to mean:

"[T]hat portion of net premiums which the insurance company has not yet had time to earn or, more precisely, that portion of the premiums paid by the policyholder which must be returned to him on cancellation of the policy, and which is in direct proportion to the unexpired term which the policy has to run." Rev.Rul. 61–167; See Interstate Fire Ins. Co. v. United States, 215 F.Supp. 586, 591–593 (E. D.Tenn.1963), aff'd 339 F.2d 603 (6th Cir. 1963).

It was the Tax Court's position that when Continental assumed all of Old Buckeye's liabilities but received only 65% of the reserve for unearned premiums, the result was the acceleration of Old Buckeye's free use of 35% of the reserves, thus placing taxable income in their hands. Taxpayers conversely assert that the release to them of $10,676,071.52 of the reserve for unearned premiums was a part of the consideration received by them in a transaction amounting to a sale by them to Continental Buckeye of the assets theretofore used by the taxpayers in their conduct of the insurance business. They argue that the receipt, or release to them, of the involved sum was an integral part of a "sale or exchange" and a "complete liquidation" which by virtue of 26 U.S.C. § 337, was insulated against the imposition of income tax.

Section 337 provides:

"§ 337. Gain or loss on sales or exchanges in connection with certain liquidations.

(a) General Rule.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then *no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.*" 26 U.S.C. § 337. (Emphasis supplied.)

Section 337 allows a liquidating corporation to escape the double capital gain taxation that might otherwise accrue on both the corporate level when the assets are sold and the shareholder level on distribution of the proceeds, by eliminating the corporate tax on the sale of assets made by the liquidating corporation before distribution. The enactment eliminated the distinction created by the holdings in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), and United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950), and accomplished a parity of tax consequences at the corporate level between whether the corporation sells the assets and then distributes the proceeds in complete liquidation or distributes the assets to the shareholders in kind for sale by them. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, §§ 9.63–.64 at 386–98 (2d Ed. 1966).

The Tax Court found, and we agree, that the $10,676,071.52 became available to the taxpayers entirely because of the terms of the Reinsurance and Assumption Agreement. While this agreement was one of several documents prepared and executed in the course of the taxpayers' plan of liquidation and dissolution, it had a distinct purpose—namely, the assumption by Continental Buckeye of all of Old Buckeye's policy liabilities.

Continental, by this agreement, undertook to, and did, reinsure on its own responsibility all the policyholders whom the taxpayers had theretofore covered by its policies. For this assumption of liabilities and reinsurance the taxpayers paid and transferred to Continental Buckeye, assets having a book value of $50,078,842.71. Included in this sum was two-thirds of taxpayers' reserve for unearned premium, viz., $19,826,989.97. The remaining one-third kept by the taxpayers—the sum found taxable—was thus freed of its status as a reserve and became available to the unfettered use by taxpayers.

Under the "Reinsurance and Assumption Agreement" Continental Buckeye received cash and assets having a book value of $50,078,842.71 and assumed obligations and liabilities of the taxpayers' companies of $60,754,914.23. This assumption of liabilities in excess of the cash and the agreed value of the assets transferred resulted in an increase of $10,676,071.52 in the Companies' net worth. It represents an increase in the Companies' net worth because the insurance liability represented by the unearned premium reserve, which reserve was reported as a liability, was assumed by Continental Buckeye.

As stock casualty insurance companies, taxpayers are subject to tax under Sections 831(a) (1) and 832 of the Code. This statutory framework provides that such insurance companies are taxed on an "earned premium basis." The profits on premiums received by the companies for future insurance risks are realized as income only as the premium becomes earned, *i. e.*, over the term of the policy. This deferred taxation is accomplished by establishing a reserve for "unearned premiums" and deducting the amount of the reserve from underwriting income which is defined as "premium earned on insurance contracts during the taxable year less losses incurred and expenses involved." See Section 832(b) (3) and (4).

Commissioner's argument is that by reinsuring their policy liabilities for less than the premiums already received on those policies, all taxpayers did was pay a portion of the premiums they had received to perform future insurance services to another insurer who agreed to perform the same services. Thus, the gain realized came not as a result of a "sale or exchange" but as the result of the release of unearned premiums to the free and beneficial use of the company. The reinsurance of their policy risks eliminated the requirement of maintaining reserves to cover that portion of insurance in force.

We agree with taxpayers' assertion that the terminology employed, "Reinsurance and Assumption Agreement," should not detract from the substance and reality of the total transaction. But the substance and reality of the transaction described in the Reinsurance and Assumption Agreement was consistent with its label. The assets transferred were not sold to Continental Buckeye, they were paid to it as consideration for its *assumption* of taxpayers' liabilities and for Continental's reinsurance of the policies then on the books. We think the draftsmen nicely entitled their agreement. Throughout the correspondence setting out the negotiations leading to the final transaction, the same correct terminology was employed. We are satisfied that the descriptive language was neither unfortunate nor inadvertent.

We are not persuaded that employment of differently styled or constructed legal vehicles would have gained for appellants the advantages of § 337 of the Code, as to the $10,676,071.52 released to them under the Reinsurance and Assumption Agreement. They are in no sense victimized by a strained or overly technical application of the tax laws. We say this lest appellants entertain the impression that more astute lawyers might have gotten them "home free" with the ten million dollars which the Commissioner has subjected to tax.

It is true that in the Supplemental Agreement taxpayers contracted for a *sale* of assets to Continental. Its pream-

ble recited that the Old Buckeye Group (the taxpayers),

> "desires to sell and transfer substantially all of its assets used in its insurance business and to arrange for the transfer of its employees and operations to The Buckeye Union Insurance Company [Continental Buckeye] all upon the terms and conditions hereinafter set forth."

This contract then went on to describe specific assets to be sold—"the airplane, all automobiles, furniture, furnishings and fixtures"—and other physical assets with some specific assumptions of detailed liabilities. The purchase price for these was to be $513,054.69. Additionally, Continental agreed to buy from taxpayers the office building owned and used by them in Columbus, Ohio, for a price of $2,832,830.48, subject to an outstanding mortgage, together with some miscellaneous properties and the lessee's interest in various leases. This agreement provided that the new company, identified here as Continental Buckeye, but whose corporate name was The Buckeye Union Insurance Company, would offer employment to "all persons in the employ of any of the Buckeye Union Group [taxpayers]" and agreements not to compete with the new company were to be executed. This contract also provided that the new company, The Buckeye Union Insurance Company, would pay to the taxpayers the sum of $5,700,000 for "the good will of the Buckeye Union Group" (the taxpayers). While the preamble to the Supplemental Agreement recites that the taxpayers— Old Buckeye—"desires to sell and transfer substantially all of its assets used in its insurance business" this same agreement also provides:

> "[T]he Buckeye Union Group shall retain cash and demand deposits, time deposits, securities and other assets, not specifically required to be transferred and conveyed, in the aggregate amount of $45,534,157.11 based on values thereof (with securities valued

at convention market value) on December 31, 1964 plus an amount * * *."

The significance of this is not discussed by the Tax Court nor by the briefs to this Court.

In the taxpayers' final federal income tax return for 1965, filed January 18, 1966, they did not include in income any of the $10,676,071.52, the subject matter of this controversy. On the other hand and of significance here, is the fact that Continental Buckeye took a deduction of this amount of $10,676,071.52 in their 1965 federal income tax return, charging it to the cost of placing the assumed policies on its books. Such action, of course, would not, by itself, make correct the Commissioner's charging a tax on such sum to appellants. It portrays, however, how one party to this transaction construed what had been done. This sum of ten million dollars plus represented premiums that had actually been paid to the taxpayers. Premiums from policyholders are the basic income of all insurance companies. When these premiums become available for the use of the company to which they have been paid, they are taxable.

Appellants argue that the dollars in controversy should be looked upon as part of the price paid them for intangible items not specifically identified in the papers which structured the transaction. They assert that the right to use the name Buckeye Union, the able management that came to Continental by taking on taxpayers' employees and the giving of agreements not to compete, should be looked upon as part of the consideration for the release to them of 35% of the unearned premium reserve. None of the carefully drawn papers, however, sustain this position.

█ Because of the reinsurance, taxpayers were no longer required to maintain a reserve for unearned premiums. Since they transferred an amount equivalent to 65% of the fund to Continental Buckeye, an amount equivalent to 35%

of the reserve was released to the free and beneficial use of taxpayers. This release of reserves to the general corporate use of the companies is a taxable event. The net decrease in reserves for unearned premiums constitutes income when a casualty insurance company reinsures its policy risks and retires from business. Central Nat'l Fire Ins. Co. v. Comm'r., 22 B.T.A. 1054, 1058 (1931); Union Underwriters v. Comm'r., 4 B.T.A. 472, 473–474 (1926); see Massachusetts Fire & Marine Ins. Co. v. Comm'r., 16 B.T.A. 625 (1929), appeal dismissed, 42 F.2d 189 (2d Cir. 1930).

The income in question did not "arise from" a "sale or exchange of property" within the meaning of § 337, but from a reinsurance transaction releasing an amount equivalent to 35% of the unearned premium reserve from the state law requirement of maintaining reserves. Each view of the several-sided transactions before us suggests the correctness of the Tax Court decision. We do not believe further dissertation by us is required. We are satisfied that Judge Withey's opinion adequately articulates the reasons which led to what he identified as his Ultimate Finding:

> "The retention of unearned premium reserves by the Companies in the amount of $10,676,071.52 did not constitute a sale or exchange of property."

He further said:

> "The only dispute over the application of section 337 to the instant case is whether the transaction was a 'sale or exchange of property' within the meaning of subsection (a) of that section. We find initially that the income in question did not arise from a 'sale or exchange' but rather as a result of the elimination of the requirement of maintaining the reserves, which in turn was caused by the reinsurance of a policy risks and assumption of certain liabilities. When Continental Buckeye assumed petitioners' policy obligations, petitioners were no longer required to maintain the re-

serve for unearned premiums. Since petitioners transferred to Continental Buckeye an amount equivalent to only 65 percent of the unearned premium reserve, $10,676,071.52, or an amount equivalent to 35 percent of the reserve was thereby released to the free beneficial use of petitioners. In our opinion, this income was realized from a reinsurance transaction rather than from a 'sale or exchange' within the meaning of section 337."

We consider that the decision of the Tax Court constitutes findings of ultimate facts, and by Rule 52(a) Fed.R. Civ.P. as construed in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), we are forbidden to set them aside unless they are clearly erroneous. In our view they ae not, but are clearly sustained by the proofs. If the decision is a conclusion of law, we are in agreement with it.

Affirmed.